FILED
2013 Jan-29  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROGER D. HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:11-CV-732-VEH** |
| | ) | |
| **CVS CAREMARK** | ) | |
| **CORPORATION a/k/a CVS** | ) | |
| **PHARMACY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

THIS CAUSE is before the court on the Defendant's Motion for Summary Judgment (the "Motion") (Doc. 32) filed on September 7, 2012. The Plaintiff filed a timely Response (Doc. 42) with supporting evidence.  Defendant replied (Doc. 46) and moved to strike much of the Plaintiff's supporting evidence as inadmissible (Doc. 47 & 48).  By separate order entered contemporaneously herewith, the court granted in part and denied in part Defendant's motions to strike.  (Doc. 57.)  By ruling on Defendant's motions to strike, the court established what evidence it will consider in resolving the Motion.  Therefore, the Motion is now ripe for disposition.

## I.    FACTS[1]

### A.    General Background

Defendant CVS Caremark Corp. ("CVS") operates a number of pharmacies across the United States, including several in Alabama.  CVS groups twenty-one of its east-central Alabama pharmacies into District Five.  This district includes Store #4870 in Anniston, Alabama.  In 2005, Cody Berguson began supervising District Five.  Berguson reported directly to Donna Yeatman.

Plaintiff Roger Harris is a licensed pharmacist.  He began working at Store #4870 in March 2004. When Harris began work, he was the pharmacist-in-charge. (Doc. 37-1 at 3, ¶ 8; Doc. 38-2 at 2, ¶2.)  However, when Sherman Conway started at Store #4870, he became pharmacist-in-charge, and Harris was moved to the staff pharmacist position.  (*Id.*)  Harris's salary and benefits did not change.

From time to time, Berguson evaluated the stores in District Five.  Berguson personally prepared reports which showed how each pharmacy was performing. (*See* Doc. 34-6 at 44.)  These reports placed each pharmacy in a particular category such as "meets expectations" or "needs improvement" based on a number

---

[1]  When deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor.  *See Optimun Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F. 3d 1231, 1241 (11th Cir. 2007).  Thus, this memorandum states all disputed facts in the light most favorable to the Plaintiff.

of metrics.  (Doc. 34-6 at 39–44; Doc. 34-9 at 42.)  It is undisputed that Berguson prepared a report for Store #4870 (hereinafter "performance report").  It is also undisputed that a copy of this performance report was in Harris's personnel file just prior to his termination.  (Doc. 34-6 at 40.)

The performance report shows that Harris's pharmacy was earning a "meets expectations" rating for 2009. (Doc. 34-9 at 42; Doc. 34-6 at 44.)  In fact, the performance report gave Store #4870 two bonus points for "excellent pharmacist." (Doc. 34-9 at 42.)  Other pharmacies were rated in the  "needs improvement" category, which is below the "meets expectations" category.  (Doc. 34-6 at 44.)

Berguson contends that the performance report for Harris's pharmacy contains clerical errors.  Berguson testified that Harris's pharmacy was actually one of the worst pharmacies in his district. (Doc. 34-6 at 40.)  To support Berguson's contentions, CVS has submitted independent reports comparing the pharmacies in District Five.  (Doc. 34-21 at 21–23.)

In addition to Berguson's performance reports, CVS maintained a standardized pharmacy rating system called Triple S (stock, shop, and service). (Doc. 34-2 at 13.)  The Triple S score evaluates a pharmacy on several objective and subjective criteria, including customer satisfaction.  (Doc. 34-2 at 13–17.) The customer satisfaction component is complied through random surveys.  (*Id.*)

In 2008, CVS made several changes to its pharmacy operations. Specifically, CVS launched the Patient Care Initiative ("PCI"), which called on its pharmacists to do more than just fill prescriptions.  For example, the PCI required pharmacists to regularly call patients to make sure they were taking their prescriptions.  (Doc. 34-1 at 44.)  Additionally, pharmacists had to encourage patients to sign up for CVS's ReadyFill program.  (*See* Doc. 34-21 at 6, ¶ 7.) Under this program, CVS would automatically refill a customer's regular prescriptions.  CVS required its pharmacists to sign up a certain percentage of eligible customers for this program.  (*Id.*)

### B.    Evidence of Berguson's Alleged Age Bias

Harris contends that Berguson's age bias first appeared in 2006.  During Harris's first annual review with Berguson, Berguson asked Harris if he planned to retire soon.  (Doc. 34-1 at 7.)  At Harris's next annual review (which may have been two years later), Berguson asked Harris how old he was "now."  (Doc. 34-1 at 9.)  Then, in 2008, Berguson visited Store #4870 while Harris was working. Berguson remarked to another pharmacy employee, "I see you've got the old man working today."  (Doc.34-1 at 6, 11. )  Harris contends that after this comment, several pharmacy employees began calling him "old man."  (Doc. 34-1 at 6.) Harris made clear that he did not like this term.  (Doc. 34-1 at 5, 10–11.)  Still, the

employees continued to deride Harris as the "old man."  (Doc. 34-1 at 10–11.)

**C.     Evidence of CVS's Retaliation**

In December 2008, Harris meet with Berguson's supervisor, Donna
Yeatman.  Harris contends that, during their meeting, he told Yeatman about
Berguson's age-related comments and how these comments had infected the
pharmacy staff.  (Doc. 34-3 at 1.)  Harris further alleges that Yeatman did not
respond to his accusations either during or after their meeting.  In fact, Harris
testified that he never spoke to Yeatman after that meeting.  (Doc.  34-2 at 40.)
Harris never called the CVS ethics hotline to complain about Berguson.  (Doc. 34-
3 at 6.)  Nor has Harris submitted evidence showing he complained to anyone after
his meeting with Yeatman in December 2008.

**D.     CVS's Legitimate, Nondiscriminatory Reason for Terminating
       Harris**

CVS contends that it had a legitimate, nondiscriminatory reason to terminate
Harris—i.e., his poor performance.  Specifically, CVS cites three areas where
Harris failed to perform according to its expectations: 1) failing to meet PCI goals,
2) failing to fill prescriptions timely and accurately, and 3) failing to provide
adequate customer service.  (Doc. 33 at 17.)  The facts relevant to CVS's
legitimate, nondiscriminatory reasons are set out below.

5

Regarding the PCI program, it is undisputed that Berguson confronted Harris about his performance under PCI in November 2008.[2] (Doc. 34-2 at 5–6; Doc. 34-5 at 33.) It is further undisputed that Berguson issued Harris a written reprimand on April 8, 2009, for failing to meet a component of PCI—enrolling a certain percentage of customers in the ReadyFill program. (Doc. 34-2 at 7; Doc. 34-5 at 34.) And, it is not seriously disputed that Harris enrolled far fewer customers in the ReadyFill program than CVS expected. (See Doc. 37-4 at 30) (stating company wide goal of 25%). Still, Harris contends that neither CVS nor Berguson ever told him what their expectations were for PCI. Therefore, it was impossible for him to meet them.

Regarding timely and accurate prescriptions, a customer complained in early 2009 that Harris had misfilled her son's prescription. (Doc. 37-1 at 27–28.) The customer contended that her son spent several days in the hospital because of this misfill. Harris vigorously disputes these allegations and attributes the young man's problems to illegal drug use. However, it is undisputed that a customer accused Harris of misfilling a prescription. (*Id.*)

Additionally, it is undisputed that, in July 2009, a pharmacy employee told a customer that Store #4870 was not accepting prescriptions after four o'clock.

---

[2]  The parties dispute whether Berguson also met with Harris in January 2009.

(Doc. 34-2 at 11.)  The parties dispute how Harris handled this situation.  CVS points out that a customer certainly complained that Store #4870 refused to fill her prescription after four o'clock.  (Doc. 34-25 at 11.)  Harris counters that, when he first heard the pharmacy employee refuse to fill a prescription, he immediately corrected her and stressed that CVS fills all prescriptions.  (Doc. 34-2 at 11–12.)

It is undisputed that Berguson ultimately reprimanded Harris for this incident.  (Doc. 34-5 at 35; Doc. 37-4 at 33.)  Harris vigorously disputes the fairness of this reprimand.  Harris refused to sign the incident report and wrote his own version of events on the bottom of the page.  (Doc. 34-2 at 12; Doc. 37-4 at 33.)  According to Harris's note, he corrected the pharmacy employee before he received a phone call from corporate about the incident.  (Doc. 34-2 at 11–12; Doc. 34-5 at 35; Doc. 37-4 at 33.)  In his affidavit, Harris avers that he corrected the employee immediately upon learning she was refusing to fill prescriptions. (Doc. 37-1 at 13, ¶ 20.)  Significantly, Harris claims that the employee who refused to fill the prescription was never disciplined.  (*Id.*)

Regarding Harris's customer service, CVS points out that several customers complained about Harris and Store #4870 in general.  (*See* Doc. 34-23; Doc. 34-24; Doc. 34-25.)  Harris contends that none of these complaints are out of the ordinary and that CVS has not shown that these complaints exceeded the

complaints for other stores in Berguson's district.  Harris also contends that he

never heard about many of these customer complaints before his termination.

Additionally, CVS points to the failing Triple S score for Harris's pharmacy

as evidence of his substandard customer service.  Triple S, after all, is based in

part on customer satisfaction surveys.  It is undisputed that, on April 8, 2009 (the

same day that Berguson reprimanded Harris for failing to comply with PCI),

Berguson reprimanded Harris for failing to meet his Triple S goals.  (Doc. 37-4 at

31.)  Berguson's reprimand does not specify why Harris failed to meet his Triple

S goals.  (*Id.*)

### E.    Harris's Additional Evidence of Discrimination

In addition to his own testimony, Harris relies on the affidavits of two other

similarly situated pharmacists—Sherman Conway and James King.  (Doc. 38-1 &

Doc. 38-2.)  Conway and King describe their interaction with Berguson and aver

that he terminated them because of their age.  The court has already addressed the

relevance and admissibility of Conway's and King's affidavits.  (Doc. 57 at 8-11.)

For present purposes, the affidavits are mostly immaterial, but the court will

mention part of King's affidavit here.  King asserts that: (1) he worked under

Berguson during the relevant time period, (2) he was aware of Berguson's PCI

goals for him, (3) he always failed to meet these goals, and (4) he was never

8

disciplined for his failings.  (Doc. 38-1 at 11, ¶ 64.)

### F.   Harris's Life Post-Termination

Harris has not worked since leaving CVS in August 2009.  (Doc. 34-1 at 30.)  During his deposition, Harris testified that he made the decision to retire shortly after his termination.  (Doc. 34-1 at 29.) Despite this decision, a local correctional facility offered Harris a pharmacist position.  (Doc. 34-1 at 30.) Harris accepted the job, but depression prevented him from starting it.  (*Id.*) Harris testified that he was mentally wiped out because of the way he was terminated from CVS.   (Doc. 34-3 at 12.)

## II.   LEGAL STANDARD

### A.   General Summary Judgment Standard

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(a).  "All reasonable doubts about the facts" and "all justifiable inferences" are resolved in favor of the nonmoving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[3]  A dispute is genuine "if the

---

[3]  Rule 56 was amended in 2010. The Advisory Committee was careful to note, however, that "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510

(1986). A fact is material if it "might affect the outcome of the suit under the

governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.* The substantive law will identify which facts are material and

which are irrelevant. *Id.*

The summary judgment analysis varies somewhat depending on which party

bears the burden of proof at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United*

*States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en

banc)). If the moving party would bear the burden of proof on an issue, then it may

meet its burden on summary judgment only by presenting positive evidence

demonstrating an absence of a genuine issue of material fact—i.e., facts that

would entitle it to a directed verdict if not controverted at trial. *Id.* at 1115. Once

the moving party makes such a showing, the burden shifts to the nonmoving party

to produce significant, probative evidence demonstrating a genuine issue for trial.

*Id.*

If the nonmoving party would bear the burden of proof on an issue at trial,

then the moving party can satisfy its initial burden on summary judgment in either

of two ways. *Id.* at 1115-16. First, the moving party may produce affirmative

evidence negating a material fact, thereby demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 1116. If the moving party produces such evidence, then the nonmoving party must respond with positive evidence sufficient to defeat a motion for a directed verdict at trial. *Id.*

Second, the moving party may affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on a material element. *Id.* The moving party is not required to produce evidence negating its opponent's claim, but it must direct the court to the hole in the nonmoving party's case. *Id.* at 1115-16. If the moving party satisfies this burden, the nonmoving party may either point to evidence in the record which would sustain a judgment at trial or may come forward with additional evidence which would also sustain a judgment. *Id.* at 1116-17. The nonmoving party cannot simply rest on mere allegations; he must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136–37 (1992)).

### B.    Relevant Substantive Law

The ADEA prohibits employment discrimination on the basis of age. 29 U.S.C. § 623(a)(1); *O'Connor v. Consolidated Coin Caterer Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307, 1310 (1996). "A claim of unlawful age discrimination

under the ADEA may be established through direct or circumstantial evidence."

*See Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs,* 512 F.3d 1296,

1300 (11th Cir.2008). The Eleventh Circuit "define[s] direct evidence of

discrimination as evidence that reflects a discriminatory or retaliatory attitude

correlating to the discrimination or retaliation complained of by the employee.

[O]nly the most blatant remarks, whose intent could be nothing other than to

discriminate on the basis of age, . . . constitute direct evidence of discrimination."

*Id.* (citations and internal quotation marks omitted).

When a Plaintiff relies on circumstantial evidence, the court analyzes his

claim under the now familiar *McDonnell Douglas* burden shifting framework. *See*

*Kragor v. Takeda Pharm. Am., Inc.*, --- F.3d ---, No. 11-16052, 2012 WL

6618360, *2 (11th Cir. Dec. 20, 2012). The Eleventh Circuit recently described

this framework in the ADEA context:

> Under *McDonnell Douglas,* a plaintiff must first establish a
> prima facie case of discrimination, which "in effect creates a
> presumption that the employer unlawfully discriminated against the
> employee." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254,
> 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). To make out a prima facie
> case of age discrimination, the plaintiff must show four things: "(1)
> that she was a member of the protected group of persons between the
> ages of forty and seventy; (2) that she was subject to adverse
> employment action; (3) that a substantially younger person filled the
> position that she sought or from which she was discharged; and (4)
> that she was qualified to do the job for which she was rejected."

*Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1359 (11th Cir.1999).

Once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S. Ct. 1817. "This burden is one of production, not persuasion . . . ." *Reeves,* 530 U.S. at 142, 120 S. Ct. 2097. Thus, "[t]o satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997) (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089). If the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse action, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination. *See, e.g., Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *McDonnell Douglas,* 411 U.S. at 804, 93 S. Ct. 1817.

The plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs,* 106 F.3d at 1528. If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by

a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

*Kragor*, --- F.3d ---, 2012 WL 6618360, *2 (footnote omitted).

The means by which a plaintiff can call an employer's articulated reason into doubt are particularly relevant here.  First, a plaintiff may offer comments from the decision maker which betray a discriminatory animus.  *See Beaver v. Rayonier, Inc.,* 200 F.3d 723, 729–730 (11th Cir.1999).  The strength of the inference which may be drawn from such comments is determined by their substance, timing, and context.  *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999).   It logically follows that comments which are directed at a particular employee and which relate to the employment decision at issue warrant a stronger inference than stray remarks wholly unrelated to the employee or employment action.  Additionally, comments by the decision maker, which would not by themselves establish pretext, can establish pretext when combined with other evidence of discrimination.  *See Beaver*, 200 F.3d at 729–730.  Finally, the Eleventh Circuit has said that, when an employer fires an employee for violating a "work rule," the employer's reason "is arguably pretextual when a plaintiff submits evidence (1) that [he] did not violate the cited work rule, or (2) that if [he] did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Damon*,

14

196 F.3d at 1363.  Regardless of the evidence presented, the plaintiff always bears

the ultimate burden of persuasion.  *See Damon*, 196 F.3d at 1363 n.3.

### C.    ADEA Retaliation Claim

To establish a prima facie case of retaliation under the ADEA, a plaintiff

must show: (1) he engaged in a protected activity; (2) he suffered an adverse

employment action, and (3) a causal connection between the two.  *See, e.g.*, *Weeks*

*v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

To establish the causal connection prong, a plaintiff need only show that the

protected activity and the adverse employment action "were not wholly unrelated."

*Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).  However,

"[t]he cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient

evidence of causality to establish a prima facie case [of retaliation] uniformly hold

that the temporal proximity must be 'very close.'"  *Clark Cnty. Sch. Dist. v.*

*Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (citation omitted).

### D.    Hostile Work Environment Claim[4]

To establish a hostile work environment claim, a plaintiff must show: (1)

---

[4]  In resolving Harris's hostile work environment claim, the court assumes without deciding that such claims are actionable under the ADEA.  Additionally, the court assumes without deciding that Harris's hostile work environment claim is timely.

15

that he belongs in a protected group, (2) that he was subjected to unwelcome harassment, (3) that the harassment was based on the protected characteristic, (4) that the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment, and (5) a legal basis for holding the employer liable. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (citation omitted).

The sufficiently severe and pervasive prong contains "a subjective and an objective component." *Id.* at 1246 (citation omitted).  According to the Eleventh Circuit:

> [t]he employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim . . . subjectively perceive[s] . . . to be abusive."  Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"

*Id.* (citation omitted).

The Supreme Court has identified four factors which guide the objective portion of this analysis: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the

employee's job performance." *Id.* (citing to *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1997)).  The Supreme Court has further established that severe harassment does not include sporadic jokes or off-handed comments directed toward a protected class.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283–84 (1998).

### E.    Claim for Backpay under the ADEA

"A . . . plaintiff who is unlawfully terminated . . . is required to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position . . . he lost. . . .  This is a determination of fact which is subject to the 'clearly erroneous' standard of Fed.R.Civ.P. 52(a)."  *Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir. 1985); *see Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527–28 (11th Cir. 1991), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-106, § 101, 105 Stat. 1071.  Thus, an ADEA plaintiff cannot obtain back pay unless he makes reasonable efforts to mitigate his damages.  *See Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1347 (11th Cir. 2000).

## III.  ANALYSIS

### A.    ADEA Discrimination Claim

#### 1.    Direct Evidence

Harris contends that he has direct evidence of discrimination. (Doc. 42 at

17

34–35.)  Harris says that Berguson made "frequent and repeated age-based comments."  (Doc. 42 at 34.)  Harris further points to the firings of two other similarly situated CVS pharmacists—James King and Sherman Conway—who claim Berguson made age-related comments to them.  To Harris, this evidence shows an unequivocal intent to fire him because of his age.

The court rejects this argument.  Berguson's comments do not rise to the level of direct evidence.  *See Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997).  While a reasonable jury could perhaps infer age-bias from this evidence, a reasonable jury could also infer that Berguson harbored no ill-will towards older individuals.

Additionally, Harris overreaches in saying that Berguson's comments were "frequent and repeated."  In his deposition, Harris noted only three instances when Berguson made age-related comments: twice during Harris's annual review, and once while in Harris's pharmacy.  (Doc. 34-3 at 2.)  These three comments occurred over a three year period, and the last one came several months before the decision to terminate Harris.  Therefore, the court rejects Harris's characterization of Berguson's comments as direct evidence.[5]

---

[5]  Harris also says in his Response that CVS's human resources manager, Richard Howard, "testified that age was a factor in the decision to terminate Harris."  (Doc. 42 at 36.) Harris cites Howard's deposition at Doc. 34-17 at 10.  Harris's statement distorts Howard's

2.     Prima Facie Case under *McDonnell Douglas* Framework

CVS does not seriously dispute, for purposes of summary judgment, that Harris has made out a prima facie case of ADEA discrimination.  Therefore, the court will assume without deciding that Harris has a prima facie case of age discrimination.

3.     Pretext

CVS contends that Harris cannot show its legitimate, nondiscriminatory reason for his termination—i.e., Harris's poor performance—was a mere pretext for unlawful age discrimination.  CVS identifies three areas where Harris's performance was deficient: (1) failing to meet PCI goals, (2) failing to fill prescriptions timely and accurately, and (3) failing to provide adequate customer service.  Because CVS has articulated a legitimate, nondiscriminatory reason for its decision, Harris must come forward with evidence from which a reasonable jury could conclude that discrimination was the real reason CVS fired Harris.

After careful review of the summary judgment record and the parties' briefs, the court concludes that Harris has met his burden.  The court finds three pieces of

---

testimony beyond recognition.  Howard was asked how age was a factor in Harris's termination. Howard responded that CVS "always treat[s] any protected class with special consideration, in terms of being very thorough and understanding what our action is going to be."  (Doc. 34-17 at 10.)  Howard's answer in no way indicates that CVS terminated Harris because of his age.  Yet, that is exactly what Harris implies when he claims that Howard said "age was a factor in the decision to terminate Harris."

evidence particularly important.  First, Harris alleges that Berguson made age-related comments to him regarding his employment.  For example, during his first annual review, Berguson asked him when he was going to retire.  During his next annual review, Berguson asked Harris how old he was now.  And, Berguson once referred to Harris as the "old man" in front of other pharmacy employees.  These comments, standing alone, do not suffice to show pretext.  However, viewing these comments in the light most favorable to Harris, a reasonable jury could infer that Berguson harbored some disdain for older people.  Additionally, these comments were directed towards Harris and concerned his departure from CVS.  Though these comments were distant in time from Harris's termination, the court accepts, for purposes of summary judgment, that Berguson made the decision to terminate Harris.[6]  Because Berguson was the decision maker, and because a reasonable jury could infer age-related bias from his comments, a reasonable jury could also infer that Berguson continued to harbor age-related bias at the time of his decision.

Second, Harris points to Berguson's performance report, which shows that

---

[6]  There is conflicting evidence in the record about who actually made the decision to terminate Harris.  Berguson testified that he and several others made the decision together.  Richard Howard testified that Berguson made the decision.  (Doc. 34-17 at 17.)  The court accepts, for purposes of summary judgment, that Berguson made the decision to terminate Harris.

Harris's store fell in the "meets expectations" category during the relevant time period. The performance report also shows that Harris's store received two bonus points for having an excellent pharmacist. Berguson testified that he personally entered the information on his reports. If the performance report is accurate, then it calls Berguson's reasons for reprimanding Harris into doubt.

The court is aware that CVS disputes the accuracy of Berguson's performance report. CVS submitted an affidavit from Berguson stating that he made numerous clerical errors in preparing the report and failed to catch clerical errors made by Harris. If the court were to credit Berguson's affidavit, it could discredit the performance report for Harris's pharmacy. But, the court cannot do that on summary judgment. Berguson's affidavit goes to the credibility of the report and that determination is for the jury, not the court. Therefore, viewing the evidence in the light most favorable to Harris, the court accepts the report as accurate.

Berguson's affidavit also asserts that CVS has independent reports from 2009 which establish that Harris's store was in the "needs improvement" category. (Doc. 34-21 at 10–11.) CVS attached these independent reports to Berguson's affidavit. (Doc. 43-21 at 21–23.) After reviewing the independent reports, the court cannot say that Harris's store clearly fell in the "needs improvement"

category.  The independent reports are simply raw data comparing the stores in

Berguson's district.  Without further guidance from CVS, the court cannot

determine, for purposes of summary judgment, that Harris's performance reviews

contain clerical errors.  Additionally, the court has no evidence before it that

Berguson, the decision maker, considered the independent reports in deciding to

terminate Harris.

Third, Harris offers the affidavit of James King, a pharmacist who was

similarly situated to Harris.  The court has already determined that King's affidavit

is relevant and admissible.  (Doc. 57 at 8–10.)  King asserts that he was aware of

his PCI goals, he always failed to meet these goals, and that he was never

disciplined by Berguson.  These facts suggests that Berguson did not really care if

his pharmacists met their PCI goals, and thus, Harris's alleged failure to meet his

PCI goals is merely pretext.

It is undisputed that Berguson reprimanded Harris twice on the same day:

once for failing to meet his PCI goals, and once for failing to meet his Triple S

goals.  While PCI and Triple S are not the same thing, Berguson's decision to

issue two reprimands on the same day is at least peculiar.  And, when considered

in conjunction with King's testimony, Berguson's reprimand on PCI is suspect.

Neither Berguson nor CVS has articulated a reason why Berguson would write up

Harris for failing to meet his PCI goals but fail to write up King for the exact same failure.

Under *Damon v. Fleming Supermarkets of Fla., Inc.*, an employee can show that his violation of a work rule is a mere pretext for discrimination by submitting evidence that another employee, outside the protected class, violated the same work rule and was not disciplined.  196 F.3d at 1363.  Here, King was actually in the same protected class as Harris.  Still, King's testimony (considered in the light most favorable to Harris and in conjunction with Berguson's comments and the performance report for Harris's pharmacy) casts sufficient doubt on Berguson's reason for reprimanding Harris about PCI that a reasonable jury could infer Berguson acted with an ulterior motive.  And, if Berguson acted with an ulterior motive in reprimanding Harris about PCI, then the jury could infer he acted with an ulterior motive in reprimanding him about Triple S, the July 2009 incident, and when he decided to fire him.

Of course, a reasonable jury need not infer pretext.  Indeed, a reasonable jury need not believe any of the evidence on which the court relies.  The court also notes that discrepancies in the record could significantly impact Berguson's, Harris's, and King's credibility with the jury.  Nonetheless, the jury must decide which evidence to credit, not the court.

For these reasons, CVS's Motion for Summary Judgment on Harris's ADEA discrimination claim is due to be **DENIED**.

## C.    Retaliation

To establish his ADEA retaliation claim, Harris must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal connection between the two.  Harris's claim fails on the causal-connection prong.

Harris contends he complained to Donna Yeatman about Berguson's ageist comments in December 2008.  (Doc. 37-1 at 11.)  However, Berguson's first reprimand after that came almost four months later, in early April 2009.  This four month gap between Harris's complaint and Berguson's reprimand cannot establish a causal connection on a retaliation claim.[7]  *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.") (citation omitted).

Moreover, Harris complained to Yeatman, not Berguson.  Harris has no

---

[7]  The court assumes without deciding that Berguson's April 2008 reprimand is an adverse employment action.

24

evidence, nor has he alleged, that Yeatman told Berguson about Harris's complaint.   Even assuming that Yeatman did tell Berguson about the complaint, the reprimand is still too distant in time to establish a causal connection for purposes of a retaliation claim.

Although not necessary to the court's decision, the court notes an additional reason that Harris's retaliation claim fails.  "[W]hen an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *See Drago*, 453 F.3d at 1308.  Berguson first confronted Harris about his failure to meet his PCI goals in November 2008.  But, Harris first complained to Yeatman in December 2008. Because Berguson confronted Harris before Harris ever complained, then any temporal proximity between Harris's complaints and his reprimands are not enough to establish a prima facie case of retaliation.

Similarly, Harris's termination in August 2009 is too remote in time from his December 2008 complaint to establish a causal connection.

To the extent that Harris contends he engaged in protected activity (i.e., complaining about Berguson) after December 2008, his contentions are not supported by the record.  In his affidavit, Harris avers that "[a]fter I complained

each time Berguson visited the store, I was being written up." (Doc. 37-1 at 12,

¶ 18.)  As explained in the court's Order Granting in Part and Denying in Part

CVS's Motions to Strike, the court does not interpret this statement to mean that

Harris frequently complained about Berguson.  (Doc. 57 at 7–8.)  Instead, the

court interprets Harris's statement to mean that each time Berguson visited the

pharmacy after Decemeber 2008, he reprimanded Harris.[8]  This interpretation is

consistent with the record.  Harris testified that he never again spoke with Donna

Yeatman after he complained to her in December 2008.  (Doc. 34-2 at 40.)  Harris

also testified that he never called the CVS ethics hotline.  (Doc. 34-3 at 6.)  Nor

has Harris, through testimony or affidavit, identified another specific instance

where he complained to CVS about Berguson.

Additionally, it is undisputed that Berguson reprimanded Harris in April

2009 and in July 2009.  (Doc. 37-1 at 12, ¶ 18; Doc. 37-4 at 30–33.)  Harris

affidavit identifies these two incidents as the times he was written up by Berguson.

(Doc. 37-1 at 12, ¶ 18.)   Harris's affidavit also establishes that Berguson rarely

visited the pharmacy.  (Doc. 37-1 at 12, ¶ 18) (stating Berguson only visited the

pharmacy "every three to four months," and that Harris rarely saw him).  Finally,

_____

[8]  The parties dispute whether Berguson ever visited the pharmacy in January 2009.  For purposes of resolving CVS's objection, the court accepts that Berguson never met with Harris in January 2009.

in his affidavit, Harris avers that he never met with Berguson in January 2009.  If this statement is true, then the court's reading of Harris's statement is completely consistent with the record.  And even if Harris's statement is not true, then his statement that he never met with Berguson in January 2009 suggests that Harris merely forgot about this meeting in composing his affidavit.  Because Harris's affidavit does not establish that he complained about Berguson after December 2008, Harris has not created a genuine issue of fact on his retaliation claim.

Nor has Harris produced other admissible evidence showing he complained about Berguson after December 2008.  Because Harris has no evidence that he engaged in a protected activity other than in December 2008, his retaliation claim fails as a matter of law.  Thus, CVS's Motion for Summary Judgment on Harris retaliation claim is due to be **GRANTED**.

### D.    ADEA Hostile Work Environment Claim

Assuming without deciding that a hostile work environment claim is actionable under the ADEA, and assuming without deciding that Harris's hostile work environment claim is timely, this claim still fails.  The record simply does not support Harris's claim that he endured severe and pervasive harassment because of his age.  At best, Harris has shown that Berguson made three age related comments to him over the course of three years.  These comments are far

too infrequent to support a hostile work environment claim.

Harris alleges that Berguson caused Harris's subordinates to call him "old man."  Assuming this allegation is true, Harris still fails to establish he endured severe and pervasive harassment.  The term "old man" is not a threatening or particularly derogatory one.  Given the mild nature of this term, Harris has not shown his subordinates used it frequently enough to alter the terms of his employment.  In fact, Harris testified that he made his subordinates stop using the term.  (Doc. 34-1 at 11–12.)  Because Harris had the authority to make his subordinates "stop," the court cannot conclude that their comments rise to the level of severe and pervasive harassment.

Finally, Harris contends that his reprimands and termination created a hostile work environment.  The court rejects this assertion.  Even if Berguson reprimanded Harris as a pretext for age discrimination, these actions are not the kind of severe and pervasive harassment which gives rise to a hostile work environment claim.  *Mendoza*, 195 F.3d at 1245.   Therefore, CVS's Motion for Summary Judgment on Harris's hostile work environment claim is due to be **GRANTED**.

### E.    Harris's Claim for Lost Wages

A plaintiff who is terminated because of prohibited discrimination has an

obligation to mitigate his damages by making reasonable efforts to obtain comparable employment. *See Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527–28 (11th Cir. 1991), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-106, § 101, 105 Stat. 1071; *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1347 (11th Cir. 2000).

CVS contends that Harris took himself out of the job market after his termination. Harris testified that he has not worked since he left CVS. (Doc. 34-1 at 30.) And, Harris testified that he made the decision to retire about five minutes after his termination. (Doc. 34-1 at 29.)

But, that is not the whole story. A material issue of fact remains concerning the reasonableness of Harris's efforts to seek comparable employment. For example, Harris testified that he accepted a job at a local correctional facility but that depression prevented him from starting. (Doc. 34-1 at 30.) On this point, Harris specifically said, "After being treated the way I was at CVS, I just said I cannot do that job again." (*Id.*) Additionally, Harris testified that his termination wiped him out mentally so that he cannot see himself working again. (Doc. 34-3 at 12.) Viewing this testimony in the light most favorable to Harris, the court concludes that a reasonable jury could decide that Harris's efforts were reasonable under the circumstances. Because a material issue of fact remains on the issue of

back pay, CVS's Motion for Summary Judgment on this issue is due to be

**DENIED**.

## IV.    CONCLUSION

The court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion

for Summary Judgment (Doc. 32) as follows:

A.    The Motion is **DENIED** as to Harris's ADEA Discrimination claim;

B.    The Motion is **GRANTED** as to Harris's ADEA Retaliation claim;

C.    The Motion is **GRANTED** as to Harris's ADEA Hostile Work

Environment claim;

D.    The Motion is **DENIED** as to Harris's claim for back pay.

The court will set a final pretrial conference by separate order.

**DONE** and **ORDERED** this the 29th day of January, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge